William Louis Armstrong
2580 S 34th St, Milwaukee Wi, 53215
Plaintiff, in his personal capacity, and in the capacity of a representative plaintiff for a class

vs

City of Milwaukee
200 E. Wells St., Room 205
Milwaukee, WI 53202-3567
Defendant, in their personal capacity, also in official capacity, and the capacity of a representative defendant for a class in both a personal and official capacity. Also this defendant is a municipality

And

Chad Crivello
4300 S. 60th St Unit 205
Greenfield Wi, 53220.
Defendant, in personal capacity, also in official capacity with the Milwaukee police department, and.in the capacity of a representative defendant for a class in both a personal and official capacity. Also, this defendant is an individual

And

Sergio Torres
245 W. Lincoln avenue
Milwaukee Wisconsin 53207
Defendant, in personal capacity, also in official capacity, and in the capacity of a representative defendant for a class in both a personal and official capacity. Also this defendant is an individual.

And

Milwaukee Police department
245 W. Lincoln avenue
Milwaukee Wisconsin 53207
Defendant, in their personal capacity, also in official capacity, and in the capacity of a representative defendant for a class in both a personal and official capacity, also this defendant is a governmental organization

And

County of Milwaukee
633 W. Wisconsin avenue
Milwaukee Wisconsin 53203
Defendant, in their personal capacity, also in official capacity, and in the capacity of a representative defendant for a class in both their personal and official capacity

---

Just in case, all of the claims against each of the defendants above small claims dollar limitations. Claims greater than $10,000

----

**24-C-1389**

**(1) Article 3 averments, briefly**

I suffered actual injuries, including lost profits ir lost business value, and emotional suffering, and nominal damages are available for 1983 claims which should satisfy the standing requirement. Their acts deprived me of my rights to meet people for work, during what was a very important time in my professional life.

My injuries are redressable because i can be awarded money to compensate me for the injuries, under the relevant law 42 USC 1983, and my claims are being brought within the statute of limitations.

Causation is alleged in the complaint, they deprived me of civil rights and in doing so caused me injuries. Without being deprived of my rights i wouldn't have suffered those injuries.

————

**(2) Narrative pleading of facts**

In the months prior to November 10 2021 and continually to that date, plaintiff William Louis Armstrong had been doing outreach to members of the public, in a manner devised to reach a high density of members of historically marginalized and underserved communities, including prostitutes, with an intent to run for mayor, in furtherance of a lifelong dream, and to develop a public benefit company benefiting prostitutes.

(3) From the time that plaintiff William Louis Armstrong learned that President Joe Biden had nominated then Mayor Tom Barrett to be ambassador to Luxembourg, which was pretty early on following the announcement of his nomination to the ambassadorship, William Louis Armstrong regularly followed the news with an intent to run if the vacancy occurred.

(4) Prior to November 10th, and continuing up to and throughout that date, plaintiff William Louis Armstrong had developed an intent to develop an NAICS industry group 52 company, and the Plaintiff had been doing outreach work with an intent to develop such company. William Louis Armstrong had intended to advertise a business with his political candidacy for the office of Mayor in the city of Milwaukee, and the business that he eas working to develop and advertise, included a financial services application, similar to Robinhood, but which would also cater to commercial users. William Louis Armstrong had a plan to help prostitutes establish lawful passive incomes, by offering them opportunities to engage in lawful work with this business, and also by having some portion of the revenues from this business benefit them anyway in a charitable capacity. William Louis Armstrong actively intended to write such would-be former prostitutes into the cost structure of this business, operating it as something of a public benefit corporation.

(5) On November 10th 2021, William Louis Armstrong was driving near South 23rd and National avenue, when he was flagged down by a woman who expressed vocally while waving him down a desire to be given a cigarette. William Louis Armstrong pulled over and gave her a cigarette. The individual women, who said her name was Channel, asked to ride around with the plaintiff, and William Louis Armstrong said to her "Now don't do that thinking that you'll get no money from me", and in context the word "no" meant "any'. So William Louis Armstrong plainly

communicated to her that she should not expect to make a prostitution sale. She persisted in expressing a desire to join William Louis Armstrong for a drive, and William Louis Armstrong permitted her to do so, and off they were.

(6) During the drive, there was some flirtation but absolutely without any incrimination whatsoever by the Plaintiff William Louis Armstrong or the woman Chanel. The plaintiff William (7) Louis Armstrong was specifically pleased that there was no incrimination or attempted incrimination, at least as far as the Plaintiff William Louis Armstrong could discern at that time. William Louis Armstrong then, with nothing having been offered or requested in connection with offers or the performance of sexual acts or contact, invited her for a drink. William Louis Armstrong and Chanel went to Bryant's, per her suggestion. Plaintiff and Chanel had one drink each, and she continued to flirt with the plaintiff, and the plaintiff with her, after finishing their drinks they got ready to leave, she went to the bathroom, and afterwards the plaintiff and Chanel left.

(8) As of that point there had been nothing done which was incriminating for either the plaintiff or Chanelle to the plaintiff's knowledge, and the plaintiff had been regularly conducting legal review in connection with his outreach to prostitutes frequently reviewing Wisconsin statute chapter 944 and other laws, so it wasn't not to his knowledge from a place of ignorance, it was not to his knowledge from a place of regularly reviewing the laws for the work. It seemed to the Plaintiff like things might continue to progress sexually without incrimination, and so the plaintiff stopped at the Citgo on 6th and Lapham and purchased condoms, so that he would have them and could safely make that choice if so inclined and if able to do so without legal jeopardy.

(9) Plaintiff left his car running, because she told him that she was forty something years old and gainfully employed at a legitimate business, and he knew you'd have to be pretty bold to be forty something years old and steal a car, anyone who would do that would probably have a record, and they were just at the bar with cameras, so that's someone the police would be able to catch. which also, he felt, made it less likely they would at forty something years old. At the time the plaintiff felt it was unlikely that she would steal his car.

(10) While the plaintiff was in the gas station making a lawful purchase with a complete absence of criminal intention, she drove off with the plaintiff's car, and after existing the gas station the plaintiff looked around and waited for a bit, and didn't see her, and since she didn't come back in the brief time the plaintiff waited, the plaintiff called the police and they told him that he had to go into the police station to make a report so he walked to the police station.

(11) When the plaintiff went to the police station, he was questioned about what happened, the cop Chad Crivello who the plaintiff was speaking with at some point during that first encounter asked the plaintiff if he knew that she might have been a prostitute, and the fact that he said might at that point is significant because the plaintiff's lived experience was that he found out that Channel was black, started calling her a prostitute, and insisting it was a crime to even meet "them".

(12) During that first interaction with police officer Chad Crivello, he inquired about what had occured between the plaintiff and Channel, the plaintiff answered honestly. The plaintiff said they talked then overtly skipped over the details by saying "blah blah blah" or something like that, because it was otherwise an intimate evening and be didn't feel comfortable going into the details with them, and certainly not in the front lobby of a police station as the victim of a crime, having just walked a mile or so while out of shape, late in the evening. This part is significant because in the police report the officer Chad Crivello lied and said that the plaintiff said that they had "just talked" but the plaintiff never said that they had "just talked", Louis Armstrong was never reductive in that way, he openly skipped over the middle part, but he never reduced it to just talking. Chad Crivello wrote about the plaintiff misrepresenting his conduct so as to conform his representation of the Plaintiff with a negative stereotype, this civil prosecution considers that "just talked" lie to be a false statement that portrays the plaintiff as a negative and sexist stereotype.

(13) So, the plaintiff submitted the police report then went home, and while at home wanted to be sure that the police followed up the investigation and made sure to get to the bar where they had better cameras, and really the plaintiff was also a bit restless having just had his car stolen, and so was eager for more information. So the plaintiff called the police station, and asked them if they had gotten the videos from the gas station yet, intending to encourage them to follow up by seeking the bar videos, at which point Chad Crivello who the plaintiff was speaking with ended up saying "we've got the videos but it's not gonna help", and the plaintiff knew then that it could be sex and gender based discrimination but knowing that they weren't themselves guilty the plaintiff pressed, saying substantially if not verbatim, "why won't the video help" and the police said "it's not gonna help" and the plaintiff said, "why would the video that presumably shows the suspect not help not help you identify them" and the police said "because she was a prostitute i could arrest you" and Plaintiff said "Even if she was, that's not a crime for me that she's a prostitute, it's not a crime to meet them", and the police said "yes it is" and Plaintiff said "no it's not" and the police said "yes it is" and Plaintiff said "I can come down there and we can sort this out" and the police said "if you come here I'm going to arrest you" and plaintiff said "I'm on my way". So plaintiff put a password on bis phone and headed to the police station, not because he'd done anything wrong, but because he'd like them to need a warrant for the invasion of his privacy.

(14) The plaintiff arrived at the police station, then went to the front desk, put his hands up, and said "I'm here". He was there surrendering to the arrest that the police officer Chad Crivello had communicated to him that the police intended to effectuate if the plaintiff returned to that public building. At that point there's a couple things that the plaintiff did not want, he did not want an arrest to be dangerous happening at his home, and he did not want the timing of an arrest to be any worse than it already would be, and even now the plaintiffs feeling is that as much as Chad Crivello lied in the multiple police reports he would have been lying on the warrant application. The Plaintiff also had every reason to believe that they'd be able to sort it out so as to avoid serious injury, because the plaintiff was innocent, and the cop was an adult insisting it was a crime to meet people.

(15) So the plaintiff returned to the police station, and this parts on video, and the cop Chad Crivello ends up claiming that the plaintiff said she was a prostitute, in such a manner where the cop was representing that the plaintiff had represented that the woman who stole his car was a prostitute, but the plaintiff had not represented that the woman who stole his car was a prostitute, the plaintiff personally had not witnessed anything to establish her as guilty in fact of being a prostitute or violating prostitution laws. What the plaintiff said on the phone was, "even if she was, that's not a crime for me, that she's a prostitute, it's not a crime to meet them", the plaintiff had said that he's not guilty of something on account of her being guilty of something, in response to the police officer telling the plaintiff that he could arrest the plaintiff because she was guilty of something.

(16) Plaintiff absolutely had been generally doing professional outreach to prostitutes, but that specific woman flagged him down under express lawful pretense, and despite initially fitting a superficial profile, seemed less like a prostitute as things progressed, not least because the plaintiff expressly told her "now don't do that thinking that you'll get no money from" yet she persisted in trying to ride around with me, and this specific individual, again the plaintiff had witnessed nothing to establish her as guilty in fact of prostitution crime.

(17) Throughout this interaction with the police the plaintiff is repeatedly crying out to the police officer Chad Crivello that "it's not a crime to meet them", and the police officer Chad Crivello is repeatedly responding "Yes it is" just as he had previously done during the telephone conversation.

(18) Technically the words "she was" and "she's a prostitute" did come out of the plaintiffs mouth during the telephone interaction, but there were words before that and afterwards, which were an essential part of what the Plaintiff said. What the plaintiff actually said is not what the police officer was representing him to have said, Chad Crivello was claiming that the plaintiff represented that the woman who stole his car was a prostitute, but the plaintiff had made no such representation. The plaintiff would have done more to make that abundantly clear that night, but another cop officer Sergio Torres butted in and kept interrupting, and turned it into a team interrogation without having read me Miranda in the lobby of the police station while i was standing there surrendering to arrest, and instead of clarifying that it wasn't a crime to meet them, he kept trying to get the plaintiff to slip so that they could set him up and try to get away with something.

(19) The plaintiff knew when the second cop entered the fray that the situation had become much more dangerous. The plaintiff kept trying to mitigate damages with the first guy, so that he might prevent damages from being deprived of freedom to continue with his campaign and legitimate business. If only the plaintiff had gotten him to understand that it wasn't a crime to meet them, the plaintiff would have then disclosed in greater detail his lawful purposes for having the meetings, because then the police officer would be prepared to understand that there even could be a lawful purpose. Unfortunately, the plaintiff was unable to get that far with the police officers, the interaction between plaintiff and Chad Crivello was repeatedly interrupted, it became a team interrogation, while the plaintiff stood there in the lobby with his hands up,

fearful for his life. This was made worse by the fact, that in the context of criminal investigations, when the police work closely with one another, the knowledge of one is presumed to be the knowledge of all, and it was entirely clear that the police knew that it was "crime to meet them", and so what impression was the plaintiff to be left with other than the police force as a unit was prohibiting them from meeting.

(20) Eventually, the cop that had inserted himself, officer Torres, and who was aiding and abetting the deprivation of civil rights under color of law, got just enough for them to spin something and escalated the injury. He asked the plaintiff if they knew if something would be a crime, but he asked in a compound way, and the plaintiffs recollection of it is that the first part could be interpreted as stating the plaintiff had committed a crime, but the second part asked the Plaintiff if something would be a crime. In response, the plaintiff began his thought with "yeah", but realized a moment late what happened, and he noticed his affect was a little flat, and he knew he was going to stutter to start his statement over, and feared that he would be interrupted and unable to complete his thoughts and that it would be misconstrued, the plaintiff knew exactly what type of men those police officers were, and it wasn't honest men, so the plaintiff said "yeah" a couple more times, attempting to emphasize his tonal affect, so that if it was the last thing he said in that situation, the inflection of his voice would be less subject to misconstrual. The plaintiff recognized the danger and took immediate decisive action, to defend himself from their clear intent to lie and frame him. The context here is significant, the police officer Chad Crivello was already misrepresenting what had been said on the telephone. The plaintiff's fears did not arise in a vacuum, the police were already actively misrepresenting the contents of the telephone interaction.

(21) Anyway, the police framed the plaintiff for felony crimes that the plaintiff was innocent of, irrespective of the specific charges that the plaintiff faced in the previous action, the police nonetheless falsely claimed that the plaintiff admitted to felony crimes that was innocent of, and therefore framed him for felony crimes. They joined with each other, to punish the plaintiff for meeting people. They thought that he should think that he should be in trouble for even having meetings with "them". It caused substantial mental trauma and significant economic injuries to the plaintiff.

(22) In the context of criminal investigations, when police agencies are working closely with each other, the knowledge of one is presumed to be the knowledge of all. The plaintiff presumes the same thing, when the police officers in the same department, working closely with one another, are accusing him of a crime for meeting them, the knowledge of one is presumed to be the knowledge of all. Also across departments, between them and the city attorney's office, and anyone else

(23) They lied on the plaintiff in the police reports and said that he admitted felony crimes that he was absolutely innocent of. One of his campaign speeches that he had repeatedly given involved exclaiming that the district attorney basically gave the police permission to barge into our houses with our names wrong and taze us to death while showering, as they had done to

Adam Tramell. As much as they lied in the police reports, the police officer was gonna lie in the warrants and probably would have killed the Plaintiff.

(24) The plaintiffs' lived experience was that they found out the woman was black, started calling her a prostitute, and began insisting that it was a crime to meet her. It was extremely racist. It was also very sexist.

(25) In the days immediately following the initial issuance of the citation, my mother acting as my agent contacted Cavalier Johnson's office, who at the time was a member of the common council, and it took over a month for the citation to be transferred to the municipal court, so the common council had been informed of the incident which had involved me being arrested and issued a citation for meeting people when i was the victim of a crime, and the city nonetheless proceeded to commence the prosecution against me, and continued with the prosecution of me that was in direct retaliation against me for meeting people, and insisting to the police that it wasn't a crime to meet them. The common council had been made aware of the incident, and by thereafter allowing the prosecution to commence over a month later by their delegated authority, ratified the decision to prosecute me for meeting with them and to warn me against meeting with persons who they don't approve of, in their capacity as final decision makers .

(26) In the period following the injury to the plaintiff William Louis Armstrong, William Louis Armstrong suffered substantial mental distress. Contributing to the stress for the plaintiff was the fact that a month after the plaintiff's injury a black guy died there. With the Plaintiff they found out a woman was black, started calling her a prostitute, and insisted it was a crime to meet "them", and a month later a black guy died there of an overdose after having been medically cleared at the hospital, the fact that it was after being medically cleared made it very scary.

(27) Also, when the Wiz came onto Netflix, and the plaintiff checked to see who the director was and saw that the director was named Sydney Loumet, he became teary eyed, being broken hearted, because the plaintiffs name is Louie and he was unable to meet. Lou had met, and then was injured by the police and City of Milwaukee. It destroyed him.

---------

**(28) Simple and concise statements of certain alleged violations;**

**Written policy**

Milwaukee city has formal written policies that require the police to arrest people on the basis of suspicion, and that reinforce racial and sex based segregation and discrimination. Milwaukee police have a widespread and well known practice of being suspicious of people because of their race or sex, and arrest people and warn people against others because of their race or sex when carrying out the city policy.

7

(29) Milwaukee code of ordinances chapter 105, 105-125 reads in relevant part: "The chief of police and policemen respectively…shall arrest all persons found under suspicious circumstances, and shall take…and confine them."

(30) 105-126 reads in relevant part: "The members of the police force..it shall be their duty to caution strangers and others against…suspicious persons."

(31) 105-127 reads in relevant part: "Each policeman shall…arrest all and every person who…shall be reasonably suspected of having committed any felony."

(32) The Milwaukee police find constitutionally protected behavior suspicious, and are more suspicious or become suspicious of people on account of their protected characteristics, including race, and sex, et al, and also in response to people engaging in constitutionally protected activities, such as peaceable assembly in public, et al, especially if those activities are engaged in with such persons that the police might find suspicious on account of factors such as race, sex, the interracial nature of an association, free expression such as unconventional tattoos or piercings, et al.

(33) Chad Crivello was acting in accordance with this city policy when he cautioned me against the person that he found suspicious by threatening to arrest me after I met that black woman, and he cautioned me against her by informing me that he could arrest me for even having met her, and he was acting in accordance with this policy when he took me into physical custody, and when he issued the citation, and also when he caused the civil prosecution against me to be commenced, all without probable caus broadly and for the specific charge, with anything that even resembled probable cause at the time depending entirely on sex based and racial discrimination.

(34) The policy requiring arrest of people that the police find under suspicious circumstances, and cautioning strangers against suspicious people, caused violations of my constitutional rights, including my fourteenth amendment rights to equal protection, my fourth amendment rights protecting against false arrest, my fourth amendment rights protecting against seizure in connection with malicious prosecution, my first amendment rights to peaceably assemble, my first amendment rights to freedom of speech, my rights to freedom of association, my fourteenth amendment right to make contracts in connection with my business, and other due process rights related to engaging in lawful business, and my rights to property including without limitation impairing the value of my workforce in place and other business intangibles and preventing me from using my workforce in place for lawful purposes, my first amendment rights to freedom of religion, et al.

(35) As applied, and in general, the formal written policy is and was discriminatory, on the basis of sex, gender, race, protected free expression, along with other suspect classifications such as wealth, et al. In this case, the suspicion was caused by facts including the woman's race as a black person and my race as a white person, her perceived socioeconomic status because she was a pedestrian and because of where she was and its proximity to poverty, my sex and

gender as a male and her sex and gender as a female, and our perceived sexual orientations because of our sex, et al.

_____

**(36) Policy maker theory**
**Policymakers, who they are.**

**The cops**
The police officer Chad Crivello was a final policy maker with respect to the commencing of civil prosecutions against persons he found to be suspicious, a final policy maker by own right or by delegation of the authority to commence such civil prosecutions by another policy making authority such as the city common council or other authority. So the police and or relevant police officers were final policy makers originally or by delegation.

**The Milwaukee common council**
The Milwaukee common council was a final policy maker for the purposes of commencing and continuing municipal prosecutions against people in Milwaukee. At all times pertinent to this complaint, the Milwaukee common council had full authority to determine official governmental policy with respect to the performance of the police and conduct in carrying out municipal prosecutions.

**(37) Policymakers, what they did;**

**The city police**
In his official capacity as a final policy maker with respect to commencing civil prosecutions originally or by delegation, and with respect to initiating or continuing seizures or my person, Chad Crivello made a decision to seize me in my person without probable cause, and to extend the seizure of me in my person in connection with a charge without probable cause for the charge, and to commence a civil prosecution against me and caused such civil prosecution to be commenced, on the basis of sex and gender discrimination and racial discrimination, maliciously and without probable cause for the ordinance violation charged.

Chad Crivello's decision to commence the civil prosecution against me injured me in my rights, including my fourteenth amendment rights to equal protection, my fourth amendment rights protecting against false arrest, my fourth amendment rights protecting against seizure in connection with malicious prosecution, my first amendment rights to peaceably assemble, my first amendment rights to freedom of speech, my rights to freedom of association, my fourteenth amendment right to make contracts in connection with my business, and other due process rights relating to engaging in lawful business, my rights to property including without limitation impairing the value of my workforce in place and other business intangibles, my first amendment rights to freedom of religion, et al.

**(38) The common council**

In their capacity as final policy makers, the city common council made a decision to delegate authority to city police officers and others, to commence prosecutions against people, and caused any such prosecutions to be commenced by such police officers. Being aware of the police practices of racially prejudiced and sex prejudiced suspicion, and of the written city policy of arresting people and warning against people on the basis of suspicion, the city common council ratified the racist and sexist practices and customs of the Milwaukee police, by allowing such practices to continue and by attempting to ratify such practices for their own benefit by initially attempting settlement even despite overwhelming evidence of innocence in order to generate financial gain for the city. The Milwaukee common council. From the time that the civil prosecution against me had been commenced, until such time that the city attorney's office agreed to dismiss the charges with prejudice, the decision to commence and continue a prosecution against me, which was motivated by racial and sex based prejudice, had been adopted by the common council through their delegates in the City attorney's office, and otherwise.

----

**(39) Informal custom**

Milwaukee city and Milwaukee county have a pattern, practice, and custom, of widespread and recurring sex and racial selective exercise of police and prosecutorial powers, which has persisted for such an extended duration that it constitutes policy, of the city and of the county, and which the city and county have been deliberately indifferent towards.

(40) In the performance of the executive and quasi-prosecutorial functions of the city police and sheriffs, and in the performance of the prosecutorial functions of the district attorney's office for Milwaukee county, Milwaukee city and Milwaukee county have engaged in a widespread and persistent pattern of sex and gender selective seizure and prosecution, as is clearly evidenced by sex and race disparities in arrest rates and charging decisions, as well as other criminal justice practices.

(41) The city and county of Milwaukee, including by their police officers, employees of the district attorney's office, and the common council have been deliberately indifferent to the civil rights injuries caused by their widespread pattern of sex based and race based discrimination. They were acting in performance of the city and county policy of sex based and racial discrimination in the performance of police, quasi-prosecutorial, and prosecutorial functions, et al, when committed acts that caused the injury to my constitutional rights, including my fourteenth amendment rights to equal protection, my fourth amendment rights protecting against false arrest, my fourth amendment rights protecting against seizure in connection with malicious prosecution, my first amendment rights to peaceably assemble, my first amendment rights to freedom of speech, my rights to freedom of association, my fourteenth amendment right to make contracts in connection with my business, and other due process rights relating to engaging in lawful business, my first amendment rights to freedom of religion, my rights to property including without limitation impairing the value of my workforce in place and other business intangibles, et al.

(42) Chad Crivello and other officers were carrying out the city and county policy of racial and sex based discrimination, when Chad Crivello insisted to me that it was a crime to "meet them" repeatedly, while driven by racial and sex based prejudice, and when the other officers, the city attorney's office, and the common council, ratified his position by failing to correct him during the incident when he insisted to me that it was a crime to "meet them", by commencing a prosecution of me under the pretense that it was seriously unlawful to "meet them", in clear retaliation against me for having met with a black woman, and continuing with that malicious prosecution of me for roughly half a year.

____

**(43) Milwaukee failed to adequately train or supervise its police officer, Chad Crivello, and others.**

The city of Milwaukee knew that it was highly predictable that police officers and other city officials would exercise their powers of detention and arrest and commencement of civil prosecutions, on the basis of suspicion while being improperly motivated by racial prejudice and sex based prejudice, and would perform their duty of warning strangers against others while being similarly improperly motivated. This was highly predictable because the city already had a settlement with the ACLU relating to police exercise of their powers and racial disparities in their performance of their job activities, and the data collected pursuant to that settlement clearly showed significant racial and sex based disparities in the exercise of police powers. The city of Milwaukee knew that the exercise of police powers, including without limitation the powers of detention and arrest and warning against under color of law, on the basis of suspicion motivated by racial and sex based factors was highly likely, without better training and supervision, in order to correct existing widespread racial and sex based disparities, which the city was aware of and deliberately indifferent to.

(44) The city knew that police officers tend to be more suspicious of black people and people associated with black people, and of men and people associated with men, they must have known based on their aggregation and publication of the stop and frisk settlement data, and since municipal law mandates arrest of people or warning against people for even suspicion, it was highly predictable that people would be arrested because they were considered suspicious by the police on account of being black or of a certain sex or for associating with such people, or that people would be warned against others because of those protected characteristics, even if there wasn't a previous pattern of similar constitutional violations, which there was, it was still highly predictable. Although my facts differ from stop and frisk claimants, the constitutional violation injuring me was nonetheless highly predictable under the totality of circumstances, including on the basis of their awareness of the existing racial stop and frisk issue with the known racial and sex based disparities clearly evidencing heightened suspicion of black people and men.

(45) It was highly predictable that police officers in the city of Milwaukee, being improperly motivated by racial and sex based or gender based facts, would exercise their police powers in such a way that would prevent or deter black people and men in some proportion from lawfully peaceably assembling, freely associating, and freely enjoying their freedom of speech and other civil rights, by exposing men and black people and individuals commingled with such persons at

disparate rates to detention, arrest, the threat of arrest, color of law warnings against, and related stresses on the basis of racial and sex or gender motivated suspicion. In fact a lot of the racial and sex motivated detention happens, before, during and after peaceable assembly.

(46) They found out the woman was black, started calling her a prostitute and insisting it was a crime to meet her, and because I was a man and because she was a woman, they saw her as a prostitute and me as a John, and decided I was guilty for even meeting them. I can't escape the impression that it was motivated by racial and sex based prejudices.

(47) The city of Milwaukee's failure to adequately train and or supervise it's police officers, pursuant to its settlement with the ACLU and otherwise, caused my injury, if police officers were being held accountable for their discriminatory practices, my injury would have been avoided. I can't speak from experience regarding their racial prejudice, but I myself have some sex and gender based prejudice when weighing probable cause, and when I notice that and confront it, it becomes easy for me to see that without that the entire thing likely would have played out differently, in a way that didn't cause me serious injury. I simply don't have their deep racial prejudice to address within myself to see how differently I feel when confronting it, but I do have some sex and gender based that I'm able to recognize. If they had sufficiently trained and supervised their officers to not be motivated by prejudices, I would have never suffered the injuries complained of.

(48) The city of Milwaukee was deliberately indifferent to the restrictive and deterring effect of the Milwaukee police departments racially prejudiced and sex based prejudiced exercise of police powers including without limitation the powers of arrest and detention and the power to commence civil prosecutions and the power to issue color of law warnings, and the city attorney offices and common councils racially prejudiced and sex prejudiced charging practices.

_____
(49) Men were over 38% more likely to be stopped by the police in the fourth quarter of 2021. In the 4th qtr 2020, 10890 Females, 18370 males, 68% more men.
The racial disparities are even more significant..

_____
**(50) How my rights were injured, with reservation to claim injury to additional rights**

**my first amendment rights to peaceably assemble.** My right to peacefully assemble was injured because I was prevented from lawfully meeting with (assembling with) others by the threat of arrest for even meeting them in performance of the city policy, and punished with arrest and malicious prosecution in direct and express retaliation for having met them. I was prevented from having meetings by the communication with Chad Crivello in the course of his employment on the telephone, and I was prevented from having meetings by the circumstances of my arrest at the police station, and I was preventing from having meetings by the malicious prosecution and surroundings circumstances.

**(51) my first amendment rights to freedom of speech**. I was deprived of the free enjoyment of my right to freedom of speech, I was prevented from speaking with them, and became limited

in what i was able to do as a political advocate, I was no longer free to speak with people because I don't know who they'll call a prostitute, and might arrest me for having met them. If I can't meet with them, I can't speak with them. The injury to my right to peacefully assemble or other associational rights, also caused injury to my right to freedom of speech more generally.

**(52) my rights to freedom of association**. I was prevented from meeting people, and that's an injury to my associational rights. I also had lasting symptoms from the trauma, for a while every time i saw black strangers, it went through my head "Well I can't meet them" "id go to jail for meeting them", "they'd arrest me for meeting them". I was prevented from lawfully associating with people, because the police would suspect us and arrest me, and thought i should be punished for even associating with people.

**(53) My first amendment rights to freedom of religion.** The outreach i was conducting had various aspects, there was political aspect, business aspect, religious aspect, scientific aspect, charity aspect, recreational aspect, et al. Some of it had a religious significance.

**(54) My fourth amendment rights protecting against false arrest.** I was seized in my person without probable cause. The arresting officer did not have probable cause to believe that I committed any crime, he had only a rational basis to suspect, and without sex and gender based and racial prejudice, it's not even close. Even if they had probable cause, it would have only been probable cause for a traffic violation that i had not been cited for, and the seizure of my person was unlawfully extended by their activities related to other allegations that they had no probable cause for. The police officer Chad Crivello fabricated evidence, outright lying on me in his police reports and in the citation.

**(55) my fourth amendment rights protecting against seizure in connection with malicious prosecution**. They had no probable cause for the specific charge of loitering soliciting prostitutes allegedly in violation of local ordinance. Prosecuting me for that without probable cause for that charge injured me in my fourth amendment rights.

**(56) my rights to property including without limitation impairing the value of my workforce in place and other business intangibles and preventing me from using my workforce in place for lawful purposes.** Workforce in place is an asset, and is property, I was part of the workforce in place for my business. They prevented my workforce from working, which constituted a seizure of my property. By preventing me from using my workforce in place, freely and lawfully, they seized my property.

**(57) My fourteenth amendment rights to equal protection**. I was discriminated against on the basis of my sex and gender and because of racial facts. He was suspicious of me because I'm a man and she was a woman, and because i'm white and she was black. He performed the color of state law policy, of warning me against others and arresting me and prosecuting me, being driven by race prejudiced and sex prejudice suspicion.

**(58) my fourteenth amendment right to make contracts in connection with my business, and other due process rights relating to engaging in lawful business, including without limitation my right to occupational liberty.** I was Injured in my fourteenth amendment right to make private contracts free from unreasonable government interference, because if I can't meet for business, that significantly impairs my ability to contract. The people who I sought to serve, by political representation and growth of a public benefit corporation, were an essential part of business, that it could not do without, and I was prevented from contracting with necessary workforce. If I can't meet with them then i can't contract with them, and punishing me on the basis of suspicion was devastating to my start up. The defendants unreasonably interfered with my right to make contracts. I was also injured in my fourteenth amendment right to occupational liberty, because my occupation at the time required having lawful meetings with such persons that they kept me from meeting with.

—————
**(59) 1983 non-exhuastive pleading from jury instructions;**

**Fourth amendment, false arrest.**
Defendants, Chad Crivello, his aider and abettor officer Torres, and the City of Milwaukee, arrested the plaintiff William Louis Armstrong.

None of the defendants had sufficient cause to arrest the plaintiff.

The defendants acted under color of state law.

—————
**(60) Fourth amendment, excessive detention under 48 hours;**
William Louis Armstrong the plaintiff was arrested without an arrest warrant.

Defendants Chad Crivello, officer Torres, and the City of Milwaukee, delayed the release of the plaintiff William Louis Armstrong, or caused the release of the plaintiff to be delayed.

The delay was unreasonable. The delay was of an unreasonable amount of time, and was for unreasonable reasons.

—————
**(61) Fair trial, fabrication of evidence;**
Defendants officer Chad Crivello, his aider and abettor officer Sergio Torres, and the city of Milwaukee, knowingly fabricated evidence that was introduced against plaintiff William Louis Armstrong during his trial.

The fabricated evidence that was so introduced, was material, to the charges against the plaintiff. They fabricated an admission to felony crimes that the plaintiff was innocent of.

Plaintiff was damaged as a result.

—————
**(62) Due process, the state created danger.**

Defendants Chad Crivellos, officer Torres', and the city of Milwaukees, acts created a strong likelihood of serious harm to plaintiff or increased the likelihood that plaintiff would suffer serious harm.

Those acts include, the city of Milwaukee's adoption, affirmance, and publication of a city policy that says the police shall arrest people on the basis of mere suspicion, and warn strangers against others who the police find to be suspicious, and the carrying out of that policy by the police officers Chad Crivello and officer Torres.

(63) Defendants Chad Crivello, Officer Torres, and the city of Milwaukee, were aware of the risk and consciously failed to take reasonable measures to prevent harm to the plaintiff. They were aware that such policy would be carried out in a manner that was discriminatory and motivated by unlawful prejudices, including without limitation, racial and sex based prejudices, and prejudice against forms of protected free expression.

(64) It was foreseeable, that the acts of adopting, ratifying, and publishing, the official government policy of arresting and warning against on the basis of suspicion, would result in constitutional injury to the plaintiff or groups that the plaintiff is a part of, including by causing wrongful arrest and prosecutions, and also by the way of chilling the free enjoyment of first amendment rights, and deterring the free enjoyment of civil rights between people and with people whom the police might find suspicious, along with other injuries that stem from the chilling of first amendment rights and injury to other rights, these injuries to civil rights and others constitute serious harm to the persons affected by their conduct..

The defendant's acts caused my injury.

The defendants acted under color of state law.

---

**(65) Failure of bystander officer to intervene.**
Defendants Chad Crivello, and the city of Milwaukee committed the primary violation of causing me to be deprived of my constitutional rights, including my first amendment rights to peaceably assembly, freedom of speech, associational freedom, et al, my fourteenth amendment right to freedom of contract without unreasonable government interference, and other rights.

Officer Torres knew that officer Chad Crivello and the city of Milwaukee was depriving me of my right to meet with other people.

(66) Officer Torres had a realistic opportunity to prevent harm from occurring, by correcting his coworker, and taking a different position with me on behalf of the police and the city of Milwaukee. He did not correct his coworker and did not represent a different with to me on behalf of the police and the city, and instead, he interrogated me without Miranda and aided and abetted the criminal deprivation of my civil rights. He failed to take reasonable steps to prevent the harm.

(67) His failure to prevent the harm, caused me to suffer the harm, of suffering a lasting deprivation of rights that caused serious injury to my lawful business, because of the police in concert or otherwise taking the position that it was a crime to "meet them", and prosecuting me under that pretense, sending a clear message, that meeting with them would be met with arrest, and prosecution, and being framed by the police.

Their failure to act was under the color of state law.

_____

**(68) Disclaimer for non-pattern jury instruction style pleading, et al**
There's no pattern jury instructions that I'm aware of for a number of my claims, despite the fact that they clearly fall within the nexus of 42 USC 1983, so from here, I'm pleading from hypothetical jury instructions being written from scratch. I'm not separately all of them yet in a jury instruction manner, for now I'm only doing the one that there's not a pattern instruction for, but intend to proceed with other jury instruction style pleading related to injuries of other rights, including without limitation, for example the right to occupational liberty, and obviously peaceably assembly and equal protection. To the extent that i may be permitted to expand on my pleadings later in this action, especially beyond the fourteen day following service matter of course amendment, I'm expressing here my intention to do so, and nothing in this complaint should be taken as limiting my pleading, by omission or otherwise. I'm pleading injury to each if the rights mentioned anywhere in this complaint, and violations of 42 USC 1983 in connection with each of those mentioned rights, irrespective of special pleading contained anywhere in this complaint or the lack thereof, and do here aver that i have legitimate and bona fide factual basis' for 1983 claims in connection with injuries to each of such rights. The complained of acts carried out or caused by officer Chad Crivello and the City of Milwaukee were egregious, and were neither random, or unauthorized.

_____

**(69) Fourteenth amendment, unreasonable government interference with contract.**
(The currently presented hypothetical instructions for my unreasonable interference with contract facts may be treated as closely paralleling tortious interference with prospective business relationships. (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party or party's; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the interference proximately caused the plaintiff injury; and (4) the plaintiff suffered actual damage or loss as a result.)

(70) William Louis Armstrong would have certainly entered into legitimate business relationships with "them", regardless of if that's taken to mean, members of the black community, members of the female sex or gender, members of the prostitute community, or members of the public found in the public. There was a reasonable probability that the plaintiff William Louis Armstrong would have entered into business relationships with those persons whom he was meeting with, at least a significant portion of such persons.

(71) The defendants acted with a conscious desire to prevent such interracial and mixed sex relationships from occurring, including without limitation by the official written city policy, designed to deter, prevent, and accommodate interference with business relationships or other relationships between or including people who are determined to be "suspicious".

(72) The interference with my prospective business relationships, caused the injury. I had been doing outreach with an intent to run for mayor and to develop and grow a business, and had intended to use my mayoral campaign for the promotion of my business. They prevented me from having meetings, with prospective customers and contractors, and in doing so caused me to suffer lost profits, and lost business value. Without being free to meet, because of the city policy, I was unable to engage in my legitimate business, and suffered actual injury.

─────
**(73) Catch all**
The city of Milwaukee, is liable under the various theories of municipal liability, including informal custom, formal custom, official written policy, official unwritten policy, ratification, failure to train, failure to supervise, et al, and in connection with injuries to various rights, mentioned and unmentioned, known and unknown.

Individual defendants in both their personal and official capacities are similarly liable, for injuries to various rights mentioned and unmentioned, known and unknown, under various theories of culpability, mentioned and unmentioned, known and unknown.

I'm also claiming a policy of the city and county of racial and sex based discrimination and segregation, which caused my injuries, and which is evidenced by sex and gender segregated bathrooms throughout the county, and the register of deeds practices related to racially restrictive covenants including the ratification of those racially restrictive covenants. The county has a policy of sex and racial discrimination and segregation that they were aware of and deliberately indifferent to, including sex segregation evidenced sex segregated public restrooms and racial segregation enforced through racially disparate criminal law enforcement involving detention of primarily black people in Milwaukee county facilities. The acts injuring me were pursuant to this policy of segregation, by custom or otherwise, the county with respect to the county policy, like the city with respect to the city policy, was deliberately indifferent to this policy and the harmful effects of 9f this policy, and was aware of the widespread segregationist practices occurring under color of law throughout Milwaukee county. The counties sexist and racist policies was also a driving force causing the injuries to the same constitutional rights of mine as are mentioned elsewhere

─────
**(74) Statement of damages**
The damages to the victim William Louis Armstrong from the violations of laws described in this complaint include lost profits under the modified new business rule and otherwise, as well as lost business value, and also, emotional distress damages, pain and suffering, medical costs, diminished earning capacity, et al.

(75) I had been dreaming up plans about what we could do to help prostitutes establish lawful passive incomes. I had at least two good ideas, one, was co-authoring recipe books, a whole book might be a lot for anyone, but if you meet a bunch of them and get them to contribute one or two recipes each, then you have something that might earn them some residuals. Two, and the main one, was for them to have passive income from the operations of a financial services company. With a single broker partner we could give them an opportunity to solicit investments and write them into the cost structure for the business, we would be able to give them something else to sell, without significant financial barriers to entry for getting them involved such as the cost of retail space or shipping.

(76):At first i thought we'd use Robinhood but then i checked their terms of service and saw they didn't allow commercial use, and what we would have been doing would have been commercial use, and this was prior to my injury that i had already pivoted to we would need our own app, because we needed an app that allowed commercial use, my initial plan to help them was commercial use of a financial services app, then it became financial services app that allows commercial use with commercial using.

(77) Our company would have been an NAICS industry group 52 company, and NAICS industry group 52 companies, have an average revenue of over 18 million dollars a year.  More specifically, our business would have been classifiable as either an NAICS industry code 522320 company or an NAICS 523120 company, 522320 includes financial transactions processing et al and 523120 includes securities brokerages et al, and businesses in 522320 industry code have an average annual revenue of over 27 million dollars per establishment. The significance includes, that there's a claim that industry code 522320 provides a better reflection of how our business would have performed during our early years, whereas similar companies in 523120 provide a better view of how our long term average revenue would look. All of this is stated of course, as much as possible, with reservation of my rights or privileges for my applicable view on this to evolve for the purposes of this lawsuit.

(78) I'm claiming six years of lost profits, at a projected long term average of eight billion dollars a year. On a typical year for our business, our revenues would have been significantly better than average per industry code 522320 establishment. My claimed lost profits and lost business value is not just derived from the average revenue for companies in the relevant industry groups, my claimed lost profits and lost business value is based on the average revenue for companies in that industry group if specified additional facts apply.

(79) I'm able to identify facts unique to the largest competitors in relevant industry groups and which would be attainable for my business, that would put the business in a group with average revenues around eight billion dollars a year, with profits from that at about two billion dollars a year, or 25% of revenues. For starters, pretty much anybody who advertised effectively and allows commercial use has revenues upwards of a billion dollars per year in the 523120 code. There's a claim that our aggressive growth strategy, innovative marketing, and competitive services, would seduce our customers and would have resulted in our balance sheets after 20

years being roughly in line with companies like Ally invest, and Vanguard, at current day levels of revenue, with our profits at about 25% of revenue.

(80) Adjusted for inflation at an average rate of 4.1% per year, that 8 billion dollars a year twenty years from now would be roughly equivalent to about 3 and a half billion dollars now. In order for my company to earn annual revenues today that would be equivalent to 8 billion dollars in annual revenue twenty years from now, my company would only need to make about three and a half billion in annual revenues at this time. The reason I'm specifying this, is because inflation here is treated differently than inflation elsewhere. I'm claiming 8 billion dollars a year twenty years from now, which is roughly equivalent to revenues of 3.5 billion dollars a year in today's money. So in order to have those revenues in the future, my company would only have to be a little better than average for well publicized investment apps that allow commercial use, it's a conservative estimate.

That's one way that I'm arriving at the lost profits at 8 billion a year, for six years.

(81) For developing that business, it should be built with "them", while being advertised with politics, next I'll explain how we're arriving at 6 years.

(82) As far as I'm concerned they set me back at least six years, two years for a pre launch period while it's developed with members of the community that we're working to benefit, beginning at the same time as a political campaign that we would use to generate pre-registrations and for other reasons such as training and for building the value of other assets such as goodwill for our company et al, and the soonest that could happen is 2030 because the next regular election is 2028. That's what I would have done, and if I were to go on to develop the business that's still what I would do, is have a pre launch period that coincides with a political campaign that's used for advertising and for training and developing other assets.

The election that was happening at the time of my injury was a special election, and so with the two year advertising and training period we would have been launching around the time of this previous regular election, but after my injury I wasn't ready to try again during this previous regular election, what they did was extremely traumatic for me, i used to be pleased to meet people, now not so much,. If we started at the beginning of the next regular election, that would push our official launch to two years after that. So there's effectively six lost profit years, from the time that we would have launched without my injury, to the time that we would even be able to launch while sticking to the business plan i believe in, that's assuming for the sake of argument that I continue with developing this business at all following my injuries, I'm a different man after what happened, after what they did my first choice would be not to, I would be able to earn money with other ventures, and so that segment of my business operations may be permanently suspended.

(83) For the lost profit claim, that explains the amount and the number of years. Adjusted for inflation at an average rate of 4.1%, and discounted at a 5% rate to account for growth on my

prospective recovery at just above an extra safe treasury rate, that gives me current value of about 6.5 billion for those six years of lost profits, but actually a bit more.

(84) For the lost business value claim, and i believe this claim is more appropriate for determining my award, I'm using an income method relying on projected future earnings. So one method i use is, using the 27 million that NAICS 522320 companies have on average, as representing where we'd be in five years, with about 25% of that in profits, which gives about 6,750,000 in cash after expenses. Similar to the lost profits calculation, I claim that we would have been in position to generate 8 billion dollars in annual revenue after twenty years, and this is based on a variety of factors. For example, Robinhood had over a million pre registrations within their pre launch period prior to officially launching, as I understand with nearly no advertising spending, and i believe we would have had more, because we would in some ways be a similar business, and their performance i think would motivate investment in us, in theory that would allow us to spend more getting pre registrations, because the retail investing element of our business would be a proven business model. Also, our commercial users would want customers, i believe the fact of allowing commercial use would tend to accelerate growth.

(85) The model I'm using for this estimate assumes 4.1% inflation with growth on cash flows that match inflation to offset it which even if actual inflation decreases that still puts us at a very reasonable long term revenue growth estimate, we're estimating the value of the business in the relevant part based only on the projections beyond year 20 and the part of the calculation being submitted at this time assumes the twenty year revenue goal is met, we're estimating income starting after 20 years at 927 million representing profits at 25% on revenues of 3,708,000,000, and adjusted for inflation at 4.1% that's roughly equivalent to a revenue stream of about 1.65 billion today, the model assumes that half of our profits are reinvested from years 20-70 earning an average compound annual growth rate CAGR of 8.69% after taxes at 21%, and then after year 70 we assume growth on the perpetuity at 3.2% a year, and we're using a discount rate of 8.7% which includes the risk free rate combined with inflation at a rate 4.1%. So from years 20-70 distributed profits grow at 4.1% and reinvested profits grow at 8.9%, then after year 70 it all shrinks to 3.2%.

(86) The model I'm using for the projection at this time uses a two step method, because, the growth on reinvestment from a portion of our cash flows would put growth too close to the discount rate, and also that specific rate is higher than I'd want it when valuing a perpetuity, and it being too close to the discount rate may inflate the valuation when using the perpetuity model. The growth on reinvestment projection of 8.69 is derived from the current 15 year CAGR of the nasdaq 100 index of around 16% and assumes that the CAGR stays within 75% of its current value but the number we're using is a little less than that, but also it roughly matches the 10.5% s&p 500 average since inception, it's an 11% CAGR minus 21% in taxes, and the annualized return (CAGR) for the nasdaq 100 since 1985 (39 years) as of September 11th is about 13.56%, so the nasdaq 100 40 year average supports our 75% projection during the projected time horizon.
After 20 years we'd expect to make upwards of 8 billion dollars a year, but my claim for lost business value relies on more conservative projections. My claim for lost business value is

twenty billion dollars, based on the stated assumptions and others. That segment of my business operations was worth at least 20 billion dollars at present day value, and the actions of the defendants destroyed that segment of my business.

(87) I'm also seeking recovery for diminished earning capacity, and medical costs, and damages for pain and suffering and other psychological injury, and against the individual defendants' in their personal capacity punitive damages.

———

**(88) Legal pleading from the statute**
The defendants the City of Milwaukee, the County of Milwaukee, Chad Crivello, Sergio Torres, the Milwaukee police department, did subjec the plaintiff t or cause the plaintiff to be subjected to the deprivation of rights secured the United States Constitution and laws of the United states, in such manner as to be unlawful for both individuals as well as municipality defendants, and by doing so did cause redressable damages to the plaintiff.

———

**(89) 1983 sufficiency of stated claim (addendum supporting plausibility with respect to certain claims, especially for indigent pleading)**
SCOTUS Rodriguez v. United States, 575 U.S. 348, 135 S. Ct. 1609, 191 L. Ed. 2d 492, 25 Fla. L. Weekly Supp. 191 (2015) "We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures"

(90) [Rodriguez supports the prosecution with respect to at least two issues which are material to this case. The first, is that some 7th circuit precedent has historically required that the degree of seizure be beyond a threshold amount in order to constitute a constitutional injury, denying relief to people who had been seized and released the same day. This SCOTUS precedent directly moots those cases, as even a prolonged traffic stop, according to SCOTUS precedent, may constitute a seizure causing constitutional injury. The fact that even a prolonged traffic stop may constitute an unlawful seizure injuring constitutional rights, makes clear that my claim should not be precluded on the basis of same day seizure and release]

(91) [Rodriguez also supports the prosecution regarding a second issue, it supports distinct treatment of probable cause for arrest on traffic violations in connection with fourth amendment claims of false arrest, versus probable cause for arrest on higher level violations. For convenience in explaining, i would start by noticing a key difference between fourth amendment false claims and fourth amendment malicious prosecution claims, where, for such false arrest claims its ordinarily required that the police have no probable cause whatsoever, but for fourth amendment malicious prosecution claims, it's required that the police have probable cause for the specific charge, and probable cause for other charges would not defeat the fourth amendment malicious prosecution claim.

 Rodriguez clearly establishes that even with respect to ordinary wrongful seizure claims, probable cause to arrest for traffic violations is treated like probable cause for other charges in

the context of fourth amendment malicious prosecution claims, and the seizure is treated similarly, in that extending the duration on the basis of charges that they have no probable cause for is considered unreasonable. That is to say, probable cause to arrest for a traffic violation is not sufficient probable cause for extending the seizure of persons in connection with other charges that they have no probable cause for. There's a traffic violation exception to the rule that probable cause for anything would defeat a fourth amendment false arrest claim. The specific contours of this exception are less well defined, but the existence of the exception is certain. In this case the exception would apply if at all applicable.]

Jury Demand

The Plaintiff William Louis Armstrong hereby Demands a Jury in ~~this Matter~~ Jury this action.

The Jury is demanded on all issues.

If able, the demand is for a Jury of 12 Applied To All Defendants

williamlouisArmstrong93@gmail.com

William Louis Armstrong
2080 S 34th St, Milwaukee WI 53215